IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

Christopher LEVY,
        Defendant.

Criminal Action No. 15-22

**MEMORANDUM OPINION**

Conti, Chief District Judge

## I. Introduction and Procedural History

On January 20, 2015, the court held a hearing with respect to whether defendant Christopher Levy ("Levy") should be detained pretrial. After a de novo review of the detention hearing before the magistrate judge, the pretrial services report, the evidence presented at the hearing, and the arguments of counsel, the court determined that Levy should be detained without bond pending trial. This memorandum opinion sets forth the reasons for the court's decision, which were detailed on the record.

On January 12, 2015, the government filed a criminal complaint against Levy.[1] (ECF No. 1.) The complaint alleged that Levy conspired to commit a Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and possessed a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c). On January 12, 2015, Levy made an initial appearance and was temporarily detained. (ECF No. 4.) On January 14, 2015, the magistrate judge held a preliminary examination and a detention hearing. (ECF No. 19.) The magistrate judge found that probable cause exists with respect to both charges. (ECF No. 21.) The magistrate judge further determined that Levy should be released on a $30,000 unsecured bond with a number of conditions,

---

1    The government also filed a criminal complaint against Levy at Criminal No. 15-19 alleging a conspiracy to engage in drug trafficking. The magistrate judge found no probable cause with respect to this charge and the court did not consider the allegations in that complaint in determining whether Levy should be detained without bond.

including a curfew. (Prelim. Ex. Hr'g Tr. 114:16–116:11, Jan. 14, 2015, ECF No. 44-1.) The government orally moved to stay the order, and the magistrate judge denied the motion. (*Id.* at 124:6–11.) The government filed a motion and a supplement with this court for an emergency stay of the pretrial release order and a de novo hearing. (ECF Nos. 17, 18.)

On January 15, 2015, the court held a hearing on the government's emergency motion and granted the stay. The de novo hearing was held on January 20, 2015. On February 3, 2015, a grand jury returned a four-count indictment against Levy. Count one charges Levy with conspiracy to commit the Hobbs Act robbery, and count two charges Levy with possession of a firearm in furtherance of a crime of violence. Count three alleges that Levy possessed a firearm while subject to a court order that met the requirements of 18 U.S.C. § 922(g)(8). Count four charges that Levy possessed a firearm while being an unlawful user of or addicted to a controlled substance. The charges in counts three and four were not before the court at the de novo detention hearing and did not affect the court's decision.

## II. Legal Standards

A judicial officer must determine whether a defendant should be detained or released pending trial. 18 U.S.C. § 3142(a). A defendant may be released on personal recognizance or an unsecured appearance bond, or, if necessary to assure the appearance of the defendant and safety of the community, release may be subject to conditions. 18 U.S.C § 3142(b) and (c). If no condition or combination of conditions will reasonably assure the appearance of the defendant or safety of the community, the judicial officer shall order that the defendant be detained prior to trial. 18 U.S.C. § 3142(e). In certain cases, a rebuttable presumption that no conditions or combination of conditions will reasonably assure the appearance of defendant as required or the safety of the community applies. 18 U.S.C. § 3142(e)(3). This rebuttable presumption applies to, among others, cases in which there is probable cause to believe that the defendant committed an offense under 18 U.S.C. § 924(c). 18 U.S.C. § 3142(e)(3)(B).

If the presumption applies, the defendant must "produce some credible evidence forming a basis for his contention that he will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986) (per curiam). This burden of production is "relatively light." *United States v. Chagra*, 850 F. Supp. 354, 357 (W.D. Pa. 1994). The factors to be considered by the court in determining whether the defendant has rebutted the presumption are set forth in 18 U.S.C. § 3142(g). *Carbone*, 793 F.2d at 561. The four factors are

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

If the presumption is rebutted, the government must show that no condition or combination of conditions would reasonably ensure the appearance of the defendant or safety of the community if defendant were to be released. 18 U.S.C. § 3142(f). Proving that the defendant poses a danger to the community requires clear and convincing evidence. *Id.* With respect to proving that the defendant is a flight risk, the

government's burden is a preponderance of the evidence. *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). The factors in 18 U.S.C. § 3142(g) guide the court's analysis. *Id.* The rebutted presumption retains evidentiary weight. *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991).

Applying the above standards, the court reviews the magistrate judge's detention decision de novo. *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985).

## III. Discussion

As an initial matter, the court notes the application to this case of the rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3). The magistrate judge found probable cause to believe Levy conspired to commit the Hobbs Act robbery and possessed a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c). Offenses under § 924(c) are subject to the rebuttable presumption. 18 U.S.C. § 3142(e)(3)(B).[2]

### A. *Evidence Before the Magistrate Judge*

At the hearing before the magistrate judge, the government proffered the testimony of Robert Kavals ("Kavals"), a detective with the Pittsburgh Bureau of Police who was assigned to the Drug Enforcement Agency as a task force officer. The criminal charges against Levy were the product of a large-scale investigation of

---

2   At the hearing before the magistrate judge, the government argued that the Hobbs Act conspiracy also triggered the application of the rebuttable presumption because it is a crime of violence. (Prelim. Ex. Hr'g Tr. 112:1–10, ECF No. 44-1.) Upon motion of the government, the court must hold a detention hearing in a case that involves "a crime of violence … for which a maximum term of imprisonment of 10 years or more is prescribed." 18 U.S.C. § 3142(f). A case involving a crime of violence does not, however, implicate the rebuttable presumption set forth in § 3142(e)(3), except for those offenses specifically enumerated in § 3142(e)(3)(A)–(E). Hobbs Act robbery, 18 U.S.C. § 1951, is not one of the enumerated offenses. *See United States v. Coleman*, Crim. No. 01-77, 2001 WL 1249682, at *4 (N.D.N.Y. July 24, 2001) ("The mere fact that the defendant is charged with a crime of violence entitling the government to a detention hearing under 18 U.S.C. § 3142(f)(1) alone does not suffice to trigger such a presumption.").

4

suspected drug trafficking in the Western District of Pennsylvania. (Prelim. Ex. Hr'g Tr. 5:7–12, ECF No. 44-1.) The investigation focused on the members of a motorcycle club called the LAW, which is an acronym for "Lords Among Warriors." (*Id.* at 5:17–21.) The investigation took place over several months and involved Title III telephone intercepts, physical and remote surveillance, and confidential informants. (*Id.* at 6:10–15.) Kavals was one of the prime monitors of the wiretaps during the investigation. (*Id.* at 4:20–23.)

The government proffered that there were a number of calls intercepted between Levy and his codefendants, Raymond Kober ("Kober") and Scott Kulikowski ("Kulikowski"). On September 7, 2014, Kulikowski told Levy that a business in the Strip District neighborhood of Pittsburgh, Nate's Cores, had a large sum of cash on the premises. (*Id.* at 8:18–9:22.) Kulikowski told Levy that an employee of the business would not fight "[i]f you go in there like you're going to go in." (*Id.* at 9:5–6.) Levy responded, "I got to find me a little shotgun I had lying around." (*Id.* at 9:7–8.) On the night of September 7, 2014, Kober told Levy to "be careful tomorrow, if you do that other thing. Don't be stupid. If it don't look right. Don't do it." (*Id.* at 9:13–16.)

On September 8, 2014, police officers followed Levy as he left his house and proceeded to the location of Nate's Cores. When Levy was approximately a couple of blocks away from Nate's Cores, police stopped him. (*Id.* at 9:22–25.) When Levy was stopped, police observed him trying to hide a gun, which was recovered when police searched the vehicle. (*Id.* at 9:25–10:4.) At the time, Levy was the subject of a protection from abuse ("PFA") order that prohibited him from possessing a firearm. (*Id.* at 10:4–6.)

Levy was taken into custody, but was granted bail on the state firearms charge. Soon after Levy was released, he called Kulikowski and said, "I fumbled the ball on that one. Dude, they got me a block away." (*Id.* at 11:3–4.) Levy additionally told Kulikowski that he would call the subject of the protection from abuse order and tell her to drop it. (*Id.* at 16:19–25.) He said, "She got to drop this PFA. That's the only thing holding me right now, that PFA; the gun and all that." (*Id.*) On January 12, 2015,

police executed a search warrant at Levy's home and recovered a pistol and an "AK-47 style assault rifle." (*Id.* at 19:19–21.)

### B. Evidence at the Hearing Before the District Court

Because of the rebuttable presumption, Levy presented evidence first. Levy proffered that his mother, Joyce Ann Levy, would be willing to for Levy to live with her and her husband. She would also testify that Levy was "needed at home." (Detention Hr'g Tr. 7:19–21, Jan. 20, 2015, ECF No. 38.) Levy relied on the pretrial services report, which recommended release subject to certain conditions. (*Id.* at 8:5–9.)

The pretrial services report noted that Levy resided in the Western District of Pennsylvania his entire life. He lived with his mother, father, brother, and grandmother. He had regular contact with his son. He has no passport and never traveled outside of the United States. Six arrests are noted on the report. The charges were withdrawn or deferred for four of those arrests. Levy pleaded guilty to disorderly conduct in 2009. A bench warrant was issued in that case on October 15, 2014. There is an active arrest warrant for Levy with respect to an arrest for harassment in August 2012. The report notes that he has thirteen active Allegheny County bench warrants related to summary motor vehicle offenses. A protection from abuse order was issued against Levy on August 8, 2012. The order lists his son and the mother of his son as protected persons. The protection from abuse order is active and is set to expire on August 8, 2015.

On cross-examination, Joyce Ann Levy testified that her son was needed at home because her husband was in the hospital with a serious medical condition. (Detention Hr'g Tr. 10:18–24, ECF No. 38.) Levy helped around the house by preparing meals and assisting family members with transportation to medical appointments. (*Id.* at 11:8–20.) Joyce Ann Levy testified that Levy had been unemployed since February 2010, when he was involved in an automobile accident. (*Id.* at 18:20–19:9.) The only money Levy received, according to his mother, was what family members gave him.

6

(*Id.* at 19:10–14.) Levy's mother did not say how much money Levy received on a monthly basis, but she stated that it was "ten [dollars] here, twenty [dollars] here." (*Id.* at 20:7–11.) Levy's grandmother also gave him money for cigarettes and iced tea when he did work to patch the roof. (*Id.* at 19:19–20:3.)

The government supplemented the record before the magistrate judge by proffering additional testimony from Detective Kavals. In an intercepted call between Levy and Kulikowski on September 8, 2014, at 1:20 p.m., Kulikowski said,

> "I mean it is up to you. Like, I mean, I went Friday. I went Friday around 2:00, and it was dead in there with just him and his mom."
>
> Levy responded, "Just them two?"
>
> Kulikowski stated, "It was just them two. yeah."
>
> Levy then stated, "Shit. I might just go in then now then."

(*Id.* at 32:16–25.) Several minutes after this, the government intercepted text messages from Kulikowski to Levy that said, "Make sure inks covered," and, "Long sleeves." (*Id.* at 33:4–5.) On September 8, 2014, at 1:58 p.m., the government intercepted a call between Kulikowski and Sabri Shannon ("Shannon"), Levy's girlfriend. In that call, Kulikowski told Shannon that Levy had just been arrested and instructed Shannon to erase the text messages between Kulikowski and Levy from the morning. (*Id.* at 35:7–11.) During this conversation, Shannon told Kulikowski that police caught Levy with a gun. (*Id.* at 35:19–20.) They proceeded to discuss which of several possible guns police found in Levy's possession.

> Shannon: "He had it. I don't know what kind of gun it was. It was like the one with the silver at the top. It was like gray at the top. I don't know. He had a gun on him."
>
> Kulkowski: "It wasn't his little one; was it?"
>
> Shannon: "No. It was— it was his black one. It was like black and gray."
>
> Kulkowski: "Is it big or small?"

7

> Shannon: "Um, like small. It's the one he brings to the club. I think that's the one."

(*Id.* at 35:22–36:6.)

On September 14, 2014, after Levy was released from custody, Kulikowski told Levy that the business they were targeting was getting a safe installed in the floor and would no longer have large amounts of cash on hand. (*Id.* at 36:20–37:1.) Kulikowski said, "So that's out the door now . . . ." (*Id.* at 37:5–6.) Levy responded, "Nah, uh, I can— I can still get him to open that up." (*Id.* at 37:7–8.) Kulikowski told Levy to wait until he had a chance to see what was happening. (*Id.* at 35:9–13.) Kulikowski said, "So yeah, you definitely dropped the ball on that. We could have— we could have been chilling with a lot of cash." (*Id.* at 35:15–17.)

With respect to the LAW motorcycle club, the government proffered that Levy, along with Kober and Kulikowski, were members of a subset of the club called "D12." (*Id.* at 38:4–10.) D12 is responsible for committing illegal activity in furtherance of the club. (*Id.*) Kober told a confidential informant that Kulikowski, Levy, and he do all the "work" for the club. (*Id.* at 38:3–4.) The government proffered that Detective Kavals would testify, based upon his law enforcement experience, that "work" in this context means illegal activity, specifically crimes of violence. (*Id.* at 56:11–19.) Kober told the informant that there is an initiation requirement to become a member of D12: "You got to do something first to get in. They'll make you do something. I don't know. Blow a car up, do something stupid, beat somebody up bad or something." (*Id.* at 38:6–11.)

The government also proffered the content of a conversation between Levy and Kober on September 27, 2014. (*Id.* at 38:12–40:7.) Levy told Kober about a number of fights he had been in the night before. Among other things, Levy stated that he grabbed someone by the throat and started punching him. (*Id.* at 40:2–4.) One of the people Levy fought talked about shooting Levy, and Levy said, "You think you're the only one with a fucking gun?" (*Id.* at 39:7–9.) Someone told Levy that he was a marine and was getting flashbacks and just wanted to kill someone. Levy bragged to

8

Kober that he said, "Dude, you're saying that around a wrong bunch of people. These mother-fuckers kill people too." (*Id.* at 40:12–14.)

### C. *Rebuttable Presumption*

The court found, based upon the information in the pretrial services report and the evidence presented, that Levy rebutted the presumption that he was likely to flee. The report indicated that he does not own a passport and has never traveled outside the United States. He lives with his mother, father, bother, and grandmother and has strong family ties to the community. "The purpose of a Section 3142(e) risk of flight determination … is to secure the appearance of the accused at trial." *Himler*, 797 F.2d at 161–62; *see United States v. Maull*, 773 F.2d 1479, 1488 (8th Cir. 1985) (en banc) (finding risk of flight shown by numerous connections to people living abroad, possession of a passport hidden in a light fixture in his house, and previously using false identification to escape prosecution in a different county); *United States v. Vortis*, 785 F.2d 327, 330 (D.C. Cir. 1986) (finding risk of flight shown by possession of thirteen United States passports of other people and a planned trip to Liberia).

With respect to the rebuttable presumption that no condition or conditions of release would reasonably assure the safety of the community, it is a close call. In determining whether the presumption has been rebutted, the court refers to the four factors set forth in 18 U.S.C. § 3142(g): the nature and circumstances of the offenses charged, the weight of the evidence against the person, the history and characteristics of the person, and the nature and seriousness of any danger to the community.

### 1. *The nature and circumstances of the offenses charged.*

Levy did not offer any evidence to rebut the presumption under this factor.

### 2. *The weight of the evidence against the person.*

Counsel for Levy argued that the weight of the evidence against him was "skimpy." (Detention Hr'g Tr. 6:10–17, ECF No. 38.) Counsel argued that the recorded conversations reflect "a lot of procrastination" and "very little … as far as a definite agreement in the conspiracy." (*Id.*) Counsel also emphasized that there was never an

actual robbery. Police arrested Levy before he reached the establishment, and counsel argued Levy could have changed his mind before he got there. (*Id.* at 6:22–7:1.) Levy lived in the area where the arrest occurred and where the alleged victim business is located, and counsel argued it was "somewhat speculative to conclude that this Defendant was really going to go forward with any robbery." (*Id.* at 7:2–4.) Counsel characterized Levy's conversations with his codefendants as bluff and bravado and argued that he was simply trying to curry favor with Kober and Kulikowski.

The court disagrees with these arguments. Levy's conversations with Kulikowski and Kober demonstrate intent to commit armed robbery. On September 7, 2014, Levy discussed the establishment with Kulikowski, including whether anyone would resist a robbery attempt. On September 8, 2014, Levy told Kulikowski, "I might just go in then now then." Levy's counsel argued that "might" implied reservations and a lack of definiteness. (*Id.* at 54:14–22.) This argument is unpersuasive because approximately ten minutes after that call, police observed Levy leave his house and drive toward Nate's Cores. When police stopped him a block away from the business, they found him in possession of a handgun. Several days later, Levy continued to discuss the possibility of committing the robbery with Kulikowski. The weight of the evidence is fairly strong.

### 3. *The history and characteristics of the person.*

Some of the information the court considers under this factor are "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." There was evidence of close family ties and of lifetime residence in the community. Levy's criminal history indicated that he was charged with several minor offenses, but most of the charges were withdrawn. The only conviction noted was a guilty plea to a disorderly conduct charge.

####### 4. *Danger to the community.*

The evidence to rebut Levy's danger to the community was the fact that he was not arrested between the alleged attempted robbery in September 2014 and his arrest on the instant charges in January 2015.

***

In sum, the evidence submitted to rebut the presumption is weak. The court will, for the purpose of this opinion, assume that the presumption is rebutted. The court found the government did not meet its burden with respect to showing, by a preponderance of the evidence, that Levy was likely to flee. The court will therefore discuss whether the government adduced clear and convincing evidence that Levy would pose a danger to the community if released.

### D. *Clear and Convincing Evidence of Danger to Community*

Even if the presumption were rebutted, it retains evidentiary weight. *Dillon*, 938 F.2d at 1416. After reviewing the record before the magistrate judge and the additional evidence submitted at the de novo hearing, the court finds by clear and convincing evidence that no condition or conditions of release would assure the safety of the community.

####### 1. *The nature and circumstances of the offense charged.*

Possession of a firearm in furtherance of a crime of violence is a serious offense, which Congress recognized by including this crime among those to which the rebuttable presumption applies. A Hobbs Act conspiracy to commit robbery is also a serious crime that "by definition … involves a substantial risk that physical force may be used against the person or property of another." *United States v. Elder*, 88 F.3d 127, 129 (2d Cir. 1996).

The evidence presented at the de novo hearing showed that Levy planned to commit armed robbery and was minutes away from the intended target with a firearm. There are few crimes which implicate a higher risk of violence than armed robbery. Had the police not intervened, there was a high risk of bodily harm to the

employees and patrons of the intended target, innocent bystanders, law enforcement, and Levy himself.

Courts have found that nature of the offenses of conspiracy to commit armed robbery and possession of a firearm in furtherance of a crime of violence weigh heavily against release. *United States v. Mercedes*, 254 F.3d 433, 437 (2d Cir. 2001); *United States v. Coleman*, Crim. No. 01-77, 2001 WL 1249682, at *4 n.2 (N.D.N.Y. July 24, 2001) ("Congress has made it clear that the nature of the crime as one of violence is an important consideration, particularly on the issue of dangerousness."). The text of the statute also instructs the court to consider "whether the offense is a crime of violence … or involves a … firearm." 18 U.S.C. § 3142(g)(1). In this case, the offenses involved a firearm and violence.

    2. *The weight of the evidence against the person.*

As discussed above, based upon the intercepted phone calls and the seizure of a handgun from Levy's vehicle during the stop on September 8, 2015, the court finds that the weight of the evidence is fairly strong.

    3. *The history and characteristics of the person.*

Testimony from Levy's mother and the pretrial services report indicated that Levy has strong family ties. He also has ties to the community as he lived in the community his entire life. The main issue in this case is the risk of danger to the community, not the risk of flight. Therefore, evidence of community ties is "of limited weight." *United States v. Delker*, 757 F.2d 1390, 1396 (3d Cir. 1985).

Evidence was presented that Levy had no employment or income for three years. His mother testified that his only financial resource was money given to him by family members. The amount of money he received—generally ten or twenty dollars at a time—would not be sufficient to support a lifestyle of any significant extent.

The court is troubled by Levy's past conduct, particularly with respect to the protection from abuse order against him. Both his son and son's mother are listed as protected persons on the order. Levy was intercepted saying that he planned to contact his son's mother to tell her to drop the protection from abuse order. Evidence

was presented that Levy is in regular contact with his son in contravention of the protection from abuse order. Levy's counsel stated that the protection from abuse order was modified to permit contact with his son, but no evidence was presented to the court about any modification. According to the record before the court, this contact violates the order. Possession of a firearm is also prohibited by the protection from abuse order. Intercepted phone calls indicated that Levy knew he was prohibited from possessing a firearm under the protection from abuse order. A handgun was seized from Levy's vehicle when he was arrested on September 8, 2014. A handgun and a rifle were seized from his room on January 12, 2015. Levy's conduct indicates a willingness to defy court orders, and is strong evidence that no condition or combination of conditions of release imposed by the court would assure the safety of the community.

    4. *Danger to the community.*

In evaluating the nature and seriousness of the danger to any person or the community, the court reconsiders the other factors. The nature and circumstances of the offense indicate that Levy is willing to use firearms to commit crimes of violence. On September 14, 2014, while on state-court bond following his arrest on September 8, 2014, Levy continued to discuss the possibility of carrying out the armed robbery. Even after Levy learned that the intended robbery victim had installed a safe, Levy indicated he was willing to force someone to open the safe through violence or threats of violence.

The court is particularly concerned that Levy may have access to firearms if he is released. Two handguns and a rifle were seized from him, but there may be other weapons available to him that law enforcement did not find. During an intercepted phone call Levy stated that he has a "little shotgun … lying around" that he has to remember where he put. (Prelim. Ex. Hr'g Tr. 9:7–9, ECF No. 44-1.) Police did not recover this shotgun. Based upon his willingness to disobey court orders and his willingness to illegally possess and use firearms, the court finds that Levy would be a danger to the community if released.

## IV. Conclusion

Considering the above factors and the totality of the circumstances, the court concludes that no condition or set of conditions would assure the safety of the community if Levy were released pending trial. Even if the presumption was rebutted, the government met its burden to show by clear and convincing evidence that defendant poses a risk of danger to the community. The nature and circumstances of the offenses and the history and characteristics of the defendant, including his lack of financial resources and his willingness to violate court orders, led the court to conclude that Levy's release would create an unjustifiable risk of danger to the community. The court considered the weight of the evidence against Levy and the presumption that no conditions would assure the safety of the community, which retains evidentiary weight even if rebutted. For these reasons, the reasons stated on the record, and the other reasons stated above, the court will enter an order of detention pending trial.

Dated: February 13, 2015
/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge